ASHLEY PATTON,

        Plaintiff,

v.

ENTERCOM KANSAS CITY, L.L.C.,

        Defendant.

Case No. 13-2186-DDC-JPO

## MEMORANDUM AND ORDER

This lawsuit arises from the broadcast of plaintiff Ashley Patton's name on a morning radio program on KRBZ 96.5-FM "The Buzz," a radio station owned and operated by defendant Entercom Kansas City L.L.C., that occurred on April 20, 2012. In this diversity action, plaintiff asserts two claims under Kansas state law: (1) false light invasion of privacy and (2) negligent supervision. This matter comes before the Court on defendant's Motion for Summary Judgment (Doc. 65). For the reasons explained below, the Court grants the motion in part and denies it in part. The Court grants the motion with respect to plaintiff's negligent supervision claim. The Court denies the motion as to plaintiff's false light invasion of privacy claim.

### I.     Uncontroverted Facts

The following facts have either been stipulated by the parties in the parties' joint stipulations of fact (Doc. 57) or are stated in the light most favorable to the plaintiff, the nonmoving party. Defendant operates a radio station called KRBZ 96.5-FM "The Buzz." The Buzz airs a morning radio program known as "Afentra's Big Fat Morning Buzz." During the "Afentra's Big Fat Morning Buzz" broadcast on April 20, 2012, on-air talent Afentra Bandokoudis (known as "Afentra") and Daniel Terreros (known as "Danny Boi") prompted

listeners to send text messages into the radio station's "text line" of the names of persons that were said to be local porn stars.[1]

On the morning of April 20, 2012, two individuals, using separate telephone numbers, texted the name "Ashley Patton" to the 96.5 "The Buzz" radio station text line. A text message sent from 913-620-6231 at 7:26:52 a.m. read "Ashley Patton Olathe south. 2007." This text message was sent by Christopher Bradley. A text message from 913-449-8510 at 7:28:33 a.m. read "Ashley pattons a whore!!!!" This text message was sent from a phone number used by Cameron Sharp, and the parties agree was not read aloud on the air. Christopher Bradley and Cameron Sharp have no connection to defendant other than the fact that they listen to the station and "follow" the station on social media.

Danny Boi performed a "Google" search to attempt to verify the information submitted by text message. That search returned pornographic images or videos of a person with a similarly-spelled name, "Ashley Payton." The plaintiff in this case, Ashley Patton, is not and never has been involved in the pornography industry.

Danny Boi stated Ashley Patton's name on-air once at approximately 7:27 a.m. Before saying her name, Danny Boi announced, "Oh, this girl is going to be good, hold on guys." He continued, "Ashley Patton, Olathe South. Let's Google this chick. This is what I have been waiting for. You know you can have your DeSoto Girls." The on-air talent further stated during the broadcast:

| Danny Boi: | Oh God, that poor girl, why would she go into that kind of pornography? |
| Afentra: | Let me see. Is this the one from Olathe South? |
| Danny Boi: | Wrath. (Laughs) |

---

[1] A recording exists of the relevant portion of "Afentra's Big Fat Morning Buzz" radio program on April 20, 2012, which has been submitted to the Court as part of the summary judgment record.

| | |
|---|---|
| Afentra: | (Laughs.) |
| Danny Boi: | Don't choke her. Jesus! |
| Afentra: | (Laughs) |
| Danny Boi: | That's not very nice. You're a poor lover. |

The on-air talent also stated that they would put a list of "alleged" porn stars on the radio

station's website:

| | |
|---|---|
| Afentra: | Alright. We'll get a list up. Mark, get the porn list. It's unofficial, the unofficial porn list of Kansas City Metro. |
| Danny Boi: | The alleged text line porn list for the Kansas City Metropolitan area. |
| Afentra: | Yeah, 'cause we can't, can't confirm or deny right? |
| Danny Boi: | Nope. |
| Afentra: | We don't know for sure where these people are from but you guys are owning up to it. |
| Danny Boi: | Um hm. Um hm. |

"Afentra's Big Fat Morning Buzz" radio program aired from 6:00 to 10:00 a.m.

Sometime after 10:00 a.m. on April 20, 2012, some portion of the radio show, including the

portion referencing Ashley Patton, was posted as a podcast on the radio station's website.

Plaintiff was not listening to 96.5-FM at the time the local porn star segment was broadcast.

Sometime between 11:00 a.m. and 1:00 p.m. that same day, plaintiff received a text message

from R.J. Trowbridge, a high school friend, telling her that she needed to check out the morning

show on 96.5-FM. Trowbridge had listened to the podcast after hearing about the broadcast

from Nate Palermo, who had listened to the broadcast live. In response to Trowbridge's text

message, plaintiff immediately got on her computer and went to a link to Afentra's morning

show. When plaintiff scrolled down, she saw a picture of what she assumed was an actual porn

star and then a list of names, the second one of which was hers. Below the list was a link that

she clicked on to listen. Plaintiff started to listen and believes she sent a text message to

Trowbridge and asked what she was listening for and he said, "Wait till the very end" or "Go to

the very end." Then, plaintiff heard the on-air personalities say, "Oh, this is a good one. Ashley Patton Olathe South, 2007 graduate." Plaintiff listened to the podcast until it ended.

After listening to the remainder of the podcast, plaintiff exchanged text messages with Trowbridge, telling him that she was extremely upset and that she did not know who would have texted that about her. Trowbridge responded by trying to comfort her. Immediately after hearing the podcast, plaintiff cried for about twenty minutes. After she gathered herself, she decided she needed to telephone her father. Plaintiff called her father and told him what she had heard and asked what she should do. He told her to call the station and have them "take it down." Plaintiff sent her father a link to the website so that he could hear it.

Sometime after noon that same day, plaintiff called the radio station and reached Program Director Scott Geiger. Until the phone call from plaintiff, Geiger did not know there had been a segment about local porn stars on "Afentra's Big Fat Morning Buzz" that morning. Plaintiff told him that the morning show had called her a porn star and that she was angry. In response, Geiger asked plaintiff, "Well, are you?" Plaintiff replied that she was not and Geiger replied, "How do you know that you're not a porn star?" Plaintiff stated that she was in law school and that she did not "do anything like that." Geiger concedes that he asked plaintiff "Well, are you?" in response to her complaint about being identified as a local porn star on "Afentra's Big Fat Morning Buzz." Geiger further testified that during their phone call, he and plaintiff discussed what had happened, Geiger asked her name and the spelling of her name, Geiger performed a "Google" search of the name, and Google gave him a suggestion that did not match plaintiff's name. Geiger told plaintiff that it looked like there had been a mistake and asked if her name was Payton or Patton. Geiger told plaintiff that he would change the name from "Patton" to

"Payton" on the station's website, and after the phone call, he made that change. At the conclusion of the phone call, Geiger told plaintiff he would call her back. But he never did.

Plaintiff wanted to get off of the phone with Geiger. He was making her even more upset, and she was not satisfied with Geiger's response. His continuing to ask if she was, in fact, a porn star made her feel as though he was saying she was lying and that she did not want anyone to know because she was, in fact, a porn star. Plaintiff again called her father and told him that nothing was being done at the station. Her father advised her to call the station owners. Plaintiff researched the station's website and found defendant's name. She then went to defendant's website, found a phone number, and called it. She was directed to defendant's attorney, with whom she spoke.

The attorney, Andrew Sutor, told plaintiff that "they were going to take it down" and told her that he would call her back. When he called her back, Sutor told plaintiff that her name had been taken down. Plaintiff went online to check, and she found that the name "Patton" had been changed to "Payton." But plaintiff also discovered that the audio podcast using her name was still on the website. Plaintiff called her father a third time and reported that she had not accomplished the removal of the audio. Her father volunteered to try to call Sutor. Plaintiff then received a call from Sutor who told her that they "had it taken care of" and that they "took it down." Plaintiff checked the website, and the audio podcast as well as the list of names had been removed.

During their second call, Sutor asked if plaintiff would like a written formal apology or an apology on the air. Plaintiff responded that an apology on the air would make matters worse since she was already extremely upset and she did not want anybody else to know about it. Plaintiff told him she would think about it and return his call. After consulting with her father

and discussing whether to contact an attorney, she did not call Sutor again. By the time both the audio and the list were removed from the website it was about 1:00 p.m.

Plaintiff was shaken up after the second phone call with Sutor and after checking the website to confirm that the audio podcast and list had been removed. She picked up her boyfriend from work, who observed that she was upset. Plaintiff explained to her boyfriend what had happened but she did not let him listen to the recording of the podcast. Plaintiff reported to her father that the podcast was down, and believes she may have talked once with her mother. That afternoon, plaintiff was upset and stayed in, and she believes she may have slept. That evening she attended a wine tasting/birthday party for a sorority sister in Liberty, Missouri, but stayed only about an hour and did not discuss the morning's events with anyone there.

The mention of plaintiff's name in the context of being a local porn star was embarrassing and was not something plaintiff would want anybody to think of her. The incident was also humiliating to plaintiff, and it was insulting to her to have someone say that she was a local porn star over the airwaves. Plaintiff was further inconvenienced by having to deal with defendant to get the listing of her name and the podcast removed from the website. Plaintiff is not aware, however, of any person who heard her name on the April 20, 2012 "Afentra's Big Fat Morning Buzz" radio program and believed the reference to her name was actually true. The radio broadcast on April 20, 2012 has not affected plaintiff's familial relationships, friendships, personal relationships, jobs or internships, job prospects, or academics/grades.

That weekend following the broadcast, plaintiff began to experience difficulty sleeping, which she had never experienced before. Plaintiff experienced sleeplessness a majority of the night for four or more nights a week. She had difficulty getting to sleep and then once she did, she would awaken almost hourly. She also sometimes experienced a shortness of breath when

she would awaken during the night, and there would be a feeling of "tightness."  Plaintiff also

experienced and still experiences anxiety.  Sometimes, when plaintiff thinks about what was said

on the radio, it inhibits her ability to fall asleep and she feels anxiety.  Her concern about what

was said on the radio station makes her anxious and affects her sleep because every time she

hears someone talk about The Buzz, she thinks about the incident and hopes that the person is

not preparing to say that they heard the broadcast.  If she hears the radio station while riding in a

car with someone else, she will ask to change the station.  Prior to the events of April 20, 2012,

plaintiff was not a very emotional person.  She did not, for example, cry often.  The anxiety and

sleeplessness have made her more emotional and irritable.

Plaintiff did not see a physician about her trouble sleeping until three months after the

broadcast, on July 19, 2012.  She did not inform her physician that her trouble sleeping was

connected to the broadcast.  The Progress Notes for plaintiff's appointment with Michael P.

Raines, M.D., dated July 19, 2012, state:

> Patient presents today to establish as a new patient her presenting complaint today
> is difficulty sleeping. The patient is in her first year of law school and her hours
> have been very erratic. She has gotten in the habit of going to bed at 10 and
> waking up at 2 or 3 times during the night. She denies any chest pain shortness of
> breath nausea vomiting diarrhea hematochezia hemtemesis or melena. She denies
> any undue anxiety at this time . . . .

Plaintiff began taking medication to help her sleep during the summer of 2012, and she

started taking anxiety medication toward the end of the summer of 2012 because, even

with the sleeping medication, she was still unable to maintain a good sleep schedule.  The

medications have helped plaintiff.  She still takes the sleeping medication approximately

once a week if she is feeling particularly anxious, but does not if she has to wake up early

because it makes her drowsy.  Plaintiff continues to take the anxiety medication daily.

Plaintiff never reported anxiety and sleeplessness that she claimed was due to the radio broadcast to any physician until August 28, 2013, more than sixteen months after the broadcast and four months after she filed the Complaint in this lawsuit. Plaintiff has not seen any counselor to address her anxiety or sleeplessness, though her doctor has recommended she do so. Plaintiff has not done so because she does not want to talk about the incident with another person.

Afentra agrees that falsely referring to someone as a local porn star could be highly offensive. She recalls receiving training that included directives to avoid broadcasting statements that would be false and highly offensive to a reasonable person. She also received training on examples of broadcast content that would be highly offensive to a reasonable person. Danny Boi does not recall receiving any training about invasion of privacy as it relates to radio broadcasting. He also does not recall any training that instructed him that an on-air radio broadcaster could subject the station to liability by broadcasting anything that was both false and highly offensive to a reasonable person. He does remember taking a quiz about indecency and the regulatory standards for the station for indecency, but he does not recall the specifics. Danny Boi also recalls getting feedback training from Program Director Scott Geiger. Geiger does not recall having discussions with Danny Boi about how to avoid false light invasion of privacy, but he remembers telling Danny Boi to tell the truth. Geiger does not remember if he has ever received any training in false light invasion of privacy as part of his employment at KRBZ, but knows he has never provided any training in false light invasion of privacy.

During the relevant time period, defendant had in effect a document titled, "Winning Within Legal Guidelines, A Guide to Defamation and Invasion of Privacy."

This document was presented to program directors of radio stations as a guideline to use for coaching on-air talent.  Defendant's expectation was the program directors would apply the guidelines in daily meetings after the shows and if there were issues correlating to the topics discussed in the document, then program directors would discuss those issues with the on-air talent.  Defendant's corporate representative testified that Program Director Scott Geiger would have received "Winning Within Legal Guidelines, A Guide to Defamation and Invasion of Privacy" and would have attended a presentation on the document in about August 2006.  Defendant expected Geiger to use the information in the Guide to manage the content of his morning show in daily post-show meetings.  Defendant does not know whether Geiger used the Guide as expected, but assumes that he did because it did not have any compliance issues with anything outlined in the Guide.

"Winning Within Legal Guidelines, A Guide to Defamation and Invasion of Privacy" contains an explanation of invasion of privacy, which is part of defendant's broadcast standards.  The Guide reads: "It is difficult to say what is 'highly offensive to a reasonable person,' and this will vary from state to state."  Defendant cannot recall a specific example when it provided training to its station managers or broadcast personnel about what "highly offensive to a reasonable person" could or would mean.  Defendant is not aware of any particular training which would have employed specific examples.  Rather, defendant instructed program directors to use their common sense based on the individual radio station's target audience.

Defendant's corporate representative testified that defendant would have expected the station manager to monitor the broadcast standards on a daily basis.  Monitoring involves listening to the radio station, and in this case, it would have been performed by

Geiger as program director.  Defendant knows of no one who monitored the broadcast on Friday, April 20, 2012, from 7:00 to 8:00 a.m., although Geiger generally listens to the radio station while he is handling his parental and household duties in the morning.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the Court views the evidence and draws inferences in the light most favorable to the nonmoving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co*., 619 F.3d 1243, 1245–46 (10th Cir. 2010)).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)).  In attempting to meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those

dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81

F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart*

*Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Thomas v. Wichita Coca–Cola Bottling*

*Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Finally, summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S.

at 327. Rather, it is an important procedure "designed 'to secure the just, speedy and

inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Plaintiff asserts two claims under Kansas law in this lawsuit. The first claim is for false

light invasion of privacy, and the second claim is for negligent supervision. The Court addresses

each claim in turn, below.

### A.  False Light Invasion of Privacy

Kansas has adopted the Restatement (Second) of Torts § 652. *Froelich v. Adair*, 516

P.2d 993, 995–96 (Kan. 1973). The Restatement identifies the four types of invasion of privacy:

intrusion upon seclusion; appropriation of name or likeness; publicity given to private life; and

publicity placing another person in a false light. *Id.* In *Rinsley v. Frydman*, 559 P.2d 334 (Kan.

1977), the Kansas Supreme Court explicitly recognized a cause of action for invasion of privacy

for false light publicity, and cited the draft version of Restatement (Second) of Torts § 652E:

"One who gives to another publicity which places [her] before the public in a false light of a kind

highly offensive to a reasonable [person], is subject to liability to the other for invasion of [her]

privacy." *Id.* at 339. The final version of § 652E provides:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977).

The Tenth Circuit has predicted that the Kansas Supreme Court would adopt the final version of Restatement (Second) of Torts § 652E (1977). *Rinsley v. Brandt*, 700 F.2d 1304, 1307 n.3 (10th Cir. 1983); *see also Pfannenstiel v. Osborne Pub. Co.*, 939 F. Supp. 1497, 1503 (D. Kan. 1996). Moreover, the Kansas Supreme Court has embraced the final version of the Restatement (Second) of Torts for other types of invasion of privacy claims. *See*, *e.g.*, *Werner v. Kliewer*, 710 P.2d 1250, 1255–57 (Kan. 1985) (applying Restatement (Second) of Torts §§ 652A (general principle), 652B (intrusion upon seclusion), and 652D (publicity given to private life)). Accordingly, the Court concludes that the Kansas Supreme Court would adopt the final version of the Restatement (Second) of Torts § 652E. In so doing, the Court is guided by the Tenth Circuit's conclusion in *Rinsley v. Brandt*, and recognizes that nothing since the Tenth Circuit reached that conclusion augurs for a different result. As such, the Court applies the Restatement (Second) of Torts § 652E in this case.

Having decided to apply § 652E here, the Court now must address one other aspect of plaintiff's position in her summary judgment papers. Plaintiff argues that when a false light plaintiff is not a public official or public figure and the subject matter is not a subject of public interest, the plaintiff need not prove that defendant either acted with: (a) reckless disregard for the truth; or (b) actual knowledge that it was spreading a falsehood. (Pl.'s Resp. in Opp'n to

Mot. for Summ. J. (Doc. 70) at 19.)  While it is true that the Kansas courts have not expressly considered whether a false light plaintiff must always prove either knowledge or reckless disregard, the final version of Restatement (Second) of Torts § 652E includes these elements in subsection (b) and makes no distinction between public plaintiffs and private plaintiffs.  Further, the Restatement (Second) of Torts § 652E includes the following caveat:

> The Institute takes no position on whether there are any circumstances under which recovery can be obtained under this Section if the actor did not know of or act with reckless disregard as to the falsity of the matter publicized and the false light in which the other would be placed but was negligent in regard to these matters.

Restatement (Second) of Torts § 652E (1977).  Moreover, as Judge Theis explained in *Pfannenstiel v. Osborne Pub. Co.*, absent the proof of knowledge or reckless disregard, "the false light claim becomes nothing more than defamation, but without proof of damages to plaintiff's reputation."  *Pfannenstiel*, 939 F. Supp. at 1504 (citing *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982), *cert. denied*, 459 U.S. 1146 (1983)).

Therefore, the Court's decision to apply § 652E of the Restatement (Second) of Torts comes with the proviso that plaintiff must show that either (a) defendant had knowledge of or (b) acted in reckless disregard for the falsity of the publicized matter and the false light in which the falsehood would place the plaintiff.  In this case, plaintiff has identified no evidence that defendant had actual knowledge of the falsity of the statement that plaintiff was a local porn star before broadcasting her name on the local radio morning program.  Therefore, to survive summary judgment, plaintiff must come forward with admissible evidence from which a reasonable jury could find (or infer) that defendant acted in reckless disregard for the falsity of the statement.

"To show reckless disregard, the plaintiff must prove the defendant 'in fact entertained serious doubts as to the truth of [her] publication' or acted with 'a high degree of awareness of probable falsity.'" *Pfannenstiel*, 939 F. Supp. at 1504 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991)). "Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "Proof of mere negligence is not enough." *Pfannenstiel*, 939 F. Supp. at 1504 (citing *Masson*, 501 U.S. at 510).

The Kansas Court of Appeals has explained, however, that under this reckless disregard standard, the defendant does not "'automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.'" *Davis v. Hildyard*, 113 P.3d 827, 832 (Kan. Ct. App. 2005) (quoting *St. Amant*, 390 U.S. at 732). Rather, "'[t]he finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, *or is based wholly on an unverified anonymous telephone call*.'" *Id.* (quoting *St. Amant*, 390 U.S. at 732) (emphasis added). The Supreme Court in *St. Amant* also explained "[n]or will [defendant] be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless [person] would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

Here, there is evidence from which a reasonable jury could conclude that defendant acted with reckless disregard when it broadcast plaintiff's name and identified her as a local porn star. This much is undisputed. On the morning of April 20, 2012, defendant's agents solicited the station's listeners to identify local residents who were pornography stars. In response,

defendant's agents received "an unverified anonymous" text message that read "Ashley Patton Olathe south. 2007."[2] About two minutes later, defendant received a second "unverified anonymous" text message listing Ashley Patton's name.[3] Defendant's on-air talent, Danny Boi, performed a "Google" search to attempt to verify the information submitted by text message. That search returned pornographic images or videos of a person with a name similar to but different than plaintiff's name, *i.e.*, "Ashley Payton." Defendant has come forward with no facts suggesting that Danny Boi's Google investigation corroborated anything about Ashley Patton or the Olathe South portion of the unverified anonymous text message. Nonetheless, at approximately 7:27 a.m., Danny Boi announced on-air that a graduate of Olathe South named Ashley Patton was a local porn star. The summary judgment facts establish that plaintiff Ashley Patton is not a porn star. A jury could conclude that defendant acted recklessly when its agents decided to broadcast a falsehood provided by text message from an unverified and anonymous source and its lone attempt to verify that falsehood consisted of a flawed internet search that returned pornographic images for a person not the plaintiff.

Further, during the broadcast, the on-air talent said that they would put a list of "alleged" porn stars on the radio station's website. Afentra stated: "Alright. We'll get a list up. Mark, get the porn list. It's unofficial, the unofficial porn list of Kansas City Metro." Afentra further stated: "*We don't know for sure* where these people are from but you guys are owning up to it." A reasonable jury could conclude that defendant's reference to an "alleged" list of porn stars,

---

[2] Viewing the evidence in the light most favorable to plaintiff, the identity of the sender of the text message was not known at the time of the broadcast. It was later revealed that this text message was sent by Christopher Bradley.

[3] Viewing the evidence in the light most favorable to plaintiff, the identity of the sender of the text message was not known at the time of the broadcast. It was later revealed that this text message was sent by Cameron Sharp.

combined with its concession of what it did not know about the people it decided to identify by name, shows that defendant had doubts about the truth of the statements made during the program, and therefore acted recklessly.

As the Kansas Court of Appeals explained in *Davis v. Hildyard*, defendant is not entitled to prevail as a matter of law merely by invoking Afentra and Danny Boi's testimony that they believed the statements were true when they published them. In the end, a reasonable jury might find that Afentra and Danny Boi did not act recklessly when they broadcast plaintiff's name and called her a local porn star. Conversely, a reasonable jury could also find that defendant's agents acted recklessly when they broadcast plaintiff's name and identified her as a local porn star based only on information received from an anonymous, unverified source and an erroneous internet search. Therefore, the Court concludes that it may not decide that question as a matter of law, and it denies defendant's motion for summary judgment on plaintiff's false light invasion of privacy claim.

### B. Negligent Supervision

Negligent supervision is a recognized cause of action under Kansas law. *Marquis v. State Farm Fire and Cas. Co.*, 961 P.2d 1213, 1222 (Kan. 1998). "Negligent supervision includes not only the duty to supervise but also includes the duty to control persons with whom the defendant has a special relationship including the defendant's employees or persons with dangerous propensities." *Id.* at 1223 (citing *Nero v. Kan. State Univ.*, 861 P.2d 768 (Kan. 1993); *C.J.W. v. State*, 853 P.2d 4 (Kan. 1993)).

To subject an employer to liability on a negligent supervision claim, "plaintiff must show 'some causal relationship between the dangerous propensity or quality of the employee, of which the employer has or should have knowledge, and the injuries suffered by the third person; the

employer must, by virtue of knowledge of [its] employee's particular quality or propensity, have reason to believe that an undue risk of harm exists to others as a result of the continued employment of that employee; and the harm which results must be within the risk created by the known propensity . . . .'" *Kansas State Bank & Trust Co. v. Specialized Transp., Servs., Inc.*, 819 P.2d 587, 596 (Kan. 1991) (quoting *Hollinger v. Stormont Hosp. & Training Sch. for Nurses*, 578 P.2d 1121 (Kan. Ct. App. 1978), *rev. denied*, 225 Kan. 844 (1978)).

Defendant argues that the Court should grant summary judgment here because plaintiff cannot bring a claim for negligent supervision based on the underlying tort of false light invasion of privacy. Indeed, defendant correctly points out that no Kansas case has addressed a negligent supervision claim based on false light invasion of privacy tort. Defendant further relies on cases where Kansas courts have rejected negligent supervision claims where a Kansas or federal statute provides an adequate and alternative remedy. But each of those cases involved underlying employment discrimination or harassment claims, and "Kansas law does not authorize claims for negligent supervision . . . in typical employment-related litigation." *Wood v. City of Topeka*, 90 F. Supp. 2d 1173, 1195 (D. Kan. 2000) (citations omitted); *see also Polson v. Davis*, 895 F.2d 705, 710 (10th Cir. 1990) (rejecting a negligent supervision claim premised on the allegation that the defendant negligently supervised plaintiff's immediate superior and thus allowed him to violate plaintiff's civil rights); *Fiscus v. Triumph Group Operations, Inc.*, 24 F. Supp. 2d 1229, 1242–43 (D. Kan. 1998) (holding that Kansas courts do not permit a negligent supervision claim when the underlying behavior is one employee's sexual harassment of another employee); *Schweitzer-Reschke v. Avnet, Inc.*, 874 F. Supp. 1187, 1198 (D. Kan. 1995) (dismissing plaintiff's negligent supervision claim "where the aggrieved party already has an adequate remedy [for sexual harassment] under Kansas statutory law"); *Anspach v. Tomkins*

*Indus., Inc.*, 817 F. Supp. 1499, 1519–20 (D. Kan. 1993) (refusing to hold an employer liable for negligence based on its employee's violation of Title VII).

But the negligent supervision claim asserted here, unlike the cases cited by defendant, does not involve employment-related litigation where the plaintiff has an adequate statutory remedy against the purportedly negligent employer.  Rather, in this case, "the alleged victim of the employee's tortious activity is a member of the public, not another employee of the defendant." *Anspach*, 817 F. Supp. at 1520.  Therefore, the Court rejects defendant's argument that plaintiff is precluded from bringing a cause of action for negligent supervision based on the underlying tort of false light invasion of privacy.

Defendant next argues that plaintiff cannot recover on a claim for negligent supervision where she has not suffered any physical injury, but alleges only emotional distress injuries. Judge Lungstrum recently considered this same argument in *Nkemakolam v. St. John's Military Sch.*, __ F. Supp. 2d __, 2014 WL 117258 (D. Kan. Jan. 13, 2014).  In that case, the defendant sought summary judgment on plaintiffs' negligent supervision claim by arguing that a plaintiff may not recover for emotional distress in the absence of physical injury. *Id.* at *5.  Judge Lungstrum agreed that defendant's "general statement of Kansas law is correct," and he referenced the Kansas Supreme Court's application of this rule in cases involving general negligence claims. *Id.* at *5 (citing *Hough v. Atchison, Topeka and Santa Fe Ry. Co.*, 3 P.2d 499 (Kan. 1931); *St. Clair v. Denny*, 781 P.2d 1043 (Kan. 1989)).  Indeed, "[i]t has long been the general rule in Kansas that there can be no recovery for emotional distress suffered by the plaintiff which is caused by the negligence of the defendant unless it is accompanied by or results in physical injury to the plaintiff." *Hoard v. Shawnee Mission Med. Ctr.*, 662 P.2d 1214, 1219–20 (Kan. 1983) (citations omitted).

Naturally, the existence of this general rule does not, by itself, decide the summary judgment question. *Nkemakolam* illustrates as much because the court denied defendant's summary judgment motion there. The court denied summary judgment because it found plaintiffs had come forward with evidence showing they had sustained physical abuse. *Nkemakolam*, 2014 WL 117258 at *6. This evidence, when viewed in the light most favorable to plaintiffs, created questions of fact whether plaintiffs had sustained the "physical injury" required by Kansas law. *Id.* at *7. *Cf. Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 968–970 (D. Kan. 2005) (granting summary judgment on negligent supervision claim asserted against a public school district where "plaintiff sustained emotional harm [and] not physical injury").

In this case, plaintiff has come forward with no evidence that she sustained physical injury that could support a negligent supervision claim. Plaintiff alleges that she suffered damage as a result of defendant's broadcast of her name including that she felt upset, shaken, embarrassed, humiliated, and insulted. She also alleges that she cried after listening to the podcast of the radio program, and that she later experienced sleeplessness, anxiety, shortness of breath or tightness, and feeling more emotional and irritable. Our decisions establish that these injuries all amount to emotional harm that are not actionable on a negligence theory in Kansas.

For example, in *Schweizer-Reschke v. Avent, Inc.*, the court rejected plaintiff's claim for negligent infliction of emotional distress where plaintiff alleged that she suffered vomiting and diarrhea, which was not connected to the alleged sexual harassment that purportedly caused her emotional distress, and she alleged that she experienced "a general feeling of anxiety, a feeling of shortness of breath, rapid heartbeat or a sense of 'my lungs, like, collapsing, a feeling like I can't breathe.'" 874 F. Supp. at 1196–97. Granting summary judgment against plaintiff's

negligence-based claims, the court explained that "these generalized complaints are insufficient to create an issue of fact regarding actual physical injury under Kansas law." *Id.* (citing *Anderson v. Scheffler*, 752 P.2d 667, 669 (Kan. 1988) (even though plaintiff suffered shock, emotional pain, feelings of guilt, had recurring nightmares and visited a doctor for depression, he had not shown actual physical impact sufficient for claim of negligent infliction of emotional distress); *Hopkins v. State*, 702 P.2d 311, 319–20 (Kan. 1985) (generalized physical symptoms of emotional distress such as headaches and insomnia are insufficient to state a cause of action)).[4]

Likewise, in this case, the Court concludes that plaintiff may not survive summary judgment on her negligent supervision claim. She has presented no evidence of a physical injury, just emotional distress in the form of embarrassment, humiliation, feeling upset and shaken, anxiety, and sleeplessness. Accordingly, Kansas law compels judgment against plaintiff's negligent supervision claim as a matter of law.

Finally, the Court notes that plaintiff's failure to prove actual physical injury precludes her negligent supervision claim, but does not preclude her false light invasion of privacy claim where "the injury . . . is mental distress from having been exposed to public view." *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983) (citing *Time, Inc. v. Hill*, 385 U.S. 374, 384 n.9

---

[4] The Court recognizes that the relevant discussion in *Schweizer-Reschke* and the cases it cited involved claims for negligent infliction of emotional distress, and not negligent supervision. While plaintiff argues that these cases do not apply to her negligent supervision claim, the court in each instance reasoned that the plaintiff could not proceed on a negligence theory where he or she had suffered no physical injury. This is consistent with the Kansas Supreme Court's holdings in cases involving general negligence claims. *See Hough v. Atchison, Topeka and Santa Fe Ry. Co.*, 3 P.2d 499, 502 (Kan. 1931) (holding that the general rule in Kansas that damages for mental distress alone are not recoverable on a negligence claim did not apply because in that case the plaintiff did suffer physical internal injuries after being struck by a train); *see also St. Clair v. Denny*, 781 P.2d 1043, 1049 (Kan. 1989) (recognizing that Kansas law does not allow for recovery of emotional distress caused by negligence unless there is a resulting physical injury to plaintiff). While plaintiff has not alleged a negligent infliction of emotional distress claim here, her negligent supervision claim proceeds on a negligence theory like the plaintiffs in the cases cited above.

(1967)). *See also Hoard*, 662 P.2d at 1220 (after stating that "[i]t has long been the general rule in Kansas that there can be no recovery for emotional distress suffered by the plaintiff caused by the negligence of the defendant unless it is accompanied by or results in physical injury to the plaintiff," the Court explained that the rule "does not apply where the injurious conduct is willful or wanton, or the defendant acts with intent to injure.").

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendant's Motion for Summary Judgment (Doc. 65) is granted in part and denied in part. The Court grants the motion and enters summary judgment on plaintiff's negligent supervision claim. Otherwise, the Court denies defendant's motion.

**IT IS SO ORDERED.**

**Dated this 6th day of June, 2014, at Topeka, Kansas.**

**Daniel D. Crabtree**
**United States District Judge**